### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW HAMPSHIRE

**Lisa George**

   **v.**                                    Case No. 11-cv-356-PB
                                            Opinion No. 2012 DNH 097
**Michael J. Astrue, Commissioner**
**Social Security Administration**


### MEMORANDUM AND ORDER

   Lisa George seeks judicial review of a decision by the
Commissioner of the Social Security Administration denying her
application for disability insurance benefits.  George contends
that the Administrative Law Judge ("ALJ") who considered her
application improperly substituted his lay opinion for
uncontroverted expert opinions in the record.  For the reasons
provided below, I grant George's motion to reverse the
Commissioner's decision and remand the case for further
administrative proceedings.


### I.   BACKGROUND[1]

   George applied for disability insurance benefits on January
4, 2010, when she was forty-six years old.  She alleged a
disability onset date of December 1, 2009, due to bipolar

_____

[1] The background information is taken from the parties' Joint
Statement of Material Facts.  See L.R. 9.1(b).  Citations to the
Administrative Transcript are indicated by "Tr."  George has
also submitted a list of disputed facts containing citations to
the ALJ's decision.  See L.R. 9.1(c).  Because I review the
ALJ's decision in its entirety, I need not rely on either
party's interpretation of that decision.

disorder and fibromyalgia.  She finished the eleventh grade and
did not subsequently obtain a GED.  In the past she worked as a
housekeeper, a convenience store clerk, and a deli cook.

## A.   Medical Evidence

The administrative record contains treatment records from
the Weeks Medical Center as of January 9, 2009.  At that time,
George complained of severe head and muscle aches.  She reported
that her muscle aches were worsening and that she was having
difficulty getting out of bed in the morning.  A physician's
assistant diagnosed a joint disorder and suggested a possible
diagnosis of fibromyalgia.

George began treatment with Dianne Ryan, a nurse
practitioner, on March 27, 2009.  At their first appointment,
George complained of symptoms related to menopause, tendonitis,
insomnia, headaches, depression, and anxiety.  In addition, she
reported chronic pain in her arms, legs, neck, and back.  Nurse
Ryan diagnosed fibromyalgia, depression with anxiety, and
irritable bowel syndrome.  She prescribed Cymbalta for
depression and Flexeril for fibromyalgia.

On May 15, 2009, George informed Nurse Ryan that Cymbalta
was causing anxiety.  She also complained of dizziness, panic
attacks, racing thoughts, edginess, irritability, feeling

2

overwhelmed, worrying excessively, crying, difficulty sleeping, and mood swings.  She reported that she had been experiencing fleeting suicidal ideation without a specific plan for self-harm for years.  Lastly, she complained of right shoulder pain.  Nurse Ryan diagnosed depression with anxiety and tendonitis of the right shoulder.  Due to George's adverse reaction to Cymbalta, Nurse Ryan prescribed Prozac instead.

On June 22, George reported to Dr. Maude Keeshin at the Weeks Medical Center that Prozac was making her manic and that she had stopped taking it.  On July 29, she was treated for back pain and depression.  The following month, Nurse Ryan noted that George was experiencing an increase in anxiety, with attacks occurring almost daily.  She was afraid to leave the house.  Her sleep and appetite were poor.  On a positive note, she was experiencing fewer mood swings.

On October 14, Nurse Ryan noted that Prozac was not alleviating George's symptoms.  George reported feeling overwhelmed, worrying excessively, and having racing thoughts.  Her home environment was stressful, as she was living with an abusive husband and was unable to afford counseling.

On December 1, 2009, George requested from Nurse Ryan a note for work saying that she was "physically able to work."

She reported to Nurse Ryan that she was not taking Xanax or Flexeril.  She complained of occasional joint swelling and aching, for which she was taking ibuprofen to good effect.

Two weeks later, however, George reported that her pain from fibromyalgia had become unbearable.  She had chronic pain and swelling in her joints.  She also complained of isolation, depression, and back pain.  Pain and fatigue prevented her from working.  Nurse Ryan recommended psychological counseling, along with pool therapy, yoga, stress reduction, stretching, and walking for her fibromyalgia.

On January 7, 2010, George reported that Flexeril was not effective in relieving her muscle aches.  She had increased pain in her arms and legs and reported having difficulty lifting her grandchildren.  On physical examination, George's neck was noted to be tight and tender.  The following month, George reported having difficulty moving and opening things.  She complained of lower back pain, poor sleep, high stress, as well as pain in her shoulders, hands, and feet.  She also reported suicidal ideation.

On February 16, 2010, Edward Martin, Ph.D., reviewed George's records on behalf of the state disability determination agency.  Dr. Martin did not indicate what records he reviewed,

though it appears likely that he had records from 2005 from the
Catholic Medical Center and treatment records from the Weeks
Medical Center for January 9, 2009 through January 7, 2010.  His
complete assessment was:

> Claimant is 46 year female [sic] alleging Bipolar DO
> and somatic issues with an [Alleged Onset Date] of
> 12/1/2009.  Review of [Medical Evidence of Record]
> references diagnoses of Depression and Anxiety with
> medication prescribed by ARNP.  Multiple attempts made
> to secure Function Report w/o success; no
> [Consultative Evaluation] will be scheduled based on
> this FTC.  Therefore, there exists insufficient
> information to assess psychological impairments.

Tr. 200.

On February 23, 2010, George began treatment with Linda
MacDougall, a psychiatric nurse practitioner, based on a
referral from Nurse Ryan.  George reported mood swings,
depression with anxiety, insomnia, racing thoughts, panic
attacks, as well as weight fluctuation with a history of
starving, binging, and purging.  Nurse MacDougall diagnosed
bipolar affective disorder and anxiety disorder with chronic
pain.  She assigned a Global Assessment of Functioning ("GAF")
score of 50.[2]

---

[2] A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal
ideation, severe obsessional rituals, frequent shoplifting) OR
any serious impairment in social, occupational, or school
functioning (e.g., no friends, unable to keep a job)."
Diagnostic and Statistical Manual of Mental Disorders at 34 (4th

On March 3, 2010, George reported to Nurse MacDougall that she was experiencing increased panic attacks, anxiety, anger, irritability, mood swings, poor appetite, and poor sleep.  Her pain had diminished, however.  Two weeks later, she reported that her mood was still fluctuating.

On April 14, George complained to Nurse Ryan that her fibromyalgia was "up and down."  At her next appointment in June, she complained of back pain, joint pain with swelling, knee pain, and recent manic upswings.  Nurse Ryan noted sacral pain in the cervical spine with minimal touch and a normal range of motion in the spine.  On July 12, George reported that her headaches had become severe.  There was no cervical tenderness on exam.

George saw Nurse MacDougall on July 21.  She reported that Prozac was not alleviating her depression or mood swings, and that her pain was worsening her depression.  Nurse MacDougall noted that treatment options were limited because George had no insurance.  Nurse MacDougall filled out a medical source statement that same day, stating that George had bipolar disorder and that treatment only partially alleviated her depression.  She indicated that George had experienced an

---

ed. 2000) ("DSM-IV").

adverse response to several medications.  Nurse MacDougall was optimistic that George's depression could be treated to remission once the medication issues were resolved.  She opined that George was moderately limited in her ability to deal with the public and markedly limited in her ability to deal with work stress.  According to Nurse MacDougall, George was not capable of performing even a low-stress job.

On August 9, 2010, George reported frustration with pain, depression, and low energy to Nurse MacDougall.  On August 27, she told Nurse Ryan that she continued to suffer pain due to fibromyalgia in her neck, back, arm, and leg.  She also reported occasional weakness and difficulty functioning because of generalized pain.  Her mood was depressed.  She had no energy or motivation.

That same day, Nurse Ryan filled out a residual functional capacity questionnaire.  Nurse Ryan stated that George suffered from fibromyalgia, depression with anxiety, irritable bowel syndrome, obsessive compulsive disorder, rheumatoid arthritis, hypertension, migraines, and mixed bipolar disorder.  She opined that George's illness was long-term and that her prognosis was fair.  Nurse Ryan also noted that George's medications were causing side effects, including anger, vivid dreams,

irritability, rashes, and upset stomach.  According to Nurse Ryan, George's psychological conditions were affecting her physical conditions.

Nurse Ryan opined that George's symptoms would interfere with her ability to consistently concentrate on simple one-to-three step tasks for two-hour periods of time due to forgetfulness, mood swings, memory loss, and poor concentration. She thought that George's workplace productivity would be reduced by at least twenty percent.  She also stated that George would experience episodic attacks or symptoms which were likely to incapacitate her temporarily, including migraines, severe depression, fatigue, severe pain, and chronic memory loss.  The episodes were likely to happen on a daily basis and could last for days or even weeks.  According to Nurse Ryan, George was not capable of performing even a low-stress job.

On specific physical capabilities, Nurse Ryan opined that George could sit and stand for ten minutes at a time for a total of less than two hours in an eight-hour workday.  She indicated that George could lift less than ten pounds rarely; could stoop, crouch, climb ladders, and climb stairs rarely or never; and could twist and balance occasionally.  George would need to be able to shift positions at will and occasionally would need to

take unscheduled ten-minute breaks because of chronic pain,
stiffness, and fatigue.  Nurse Ryan opined that George was
likely to miss four or more days of work per month due to her
conditions.  She also stated that George had been misdiagnosed
and that her limitations had been present for years.

On October 1, 2010, Nurse MacDougall again treated George
for depression with anxiety and bipolar affective disorder.  The
following month, Nurse Ryan noted that George had not refilled
her Prozac prescription because it was causing her heartburn.
Lamictal, another psychotropic medication, was making her itchy
and had given her a rash.  George also reported having "weird
and scary dreams."  She was feeling edgy, irritable, and
emotional.  She again reported suicidal ideation.  She was
taking Vicodin for pain in her hands and had increased
migraines.

George had a follow-up appointment with Nurse MacDougall on
November 11.  She complained that her family and boyfriend were
not supporting her financially.  She felt hopeless and
overwhelmed.  She regretted that she had not been successful
with her last suicide attempt but denied any plan for suicide.
She had stopped taking Lamictal because she had developed a
rash, and had stopped taking Prozac due to stomach pains.  Nurse

9

MacDougall diagnosed depression with anxiety, bipolar affective

disorder, and obsessive compulsive disorder.  She also noted:

> [Patient's] life is a mess.  She is totally dependent
> on the good nature of those who know her for her
> survival.  She asked to be started back on Prozac @
> lower dose because that had been helpful.  Prescribing
> options are limited.  [Patient] might benefit[] from
> [in-patient] treatment but without insurance or
> demonstrated risk to self of community [sic] admission
> is highly unlikely.

Tr. 255.  Nurse MacDougall concluded by encouraging George to

think about counseling and applying for disability.

On January 13, 2011, George sought treatment from Nurse

Ryan.  She reported that her fibromyalgia pain was always

present.  She also complained of lower back discomfort.  Nurse

Ryan checked for rheumatoid arthritis, but the rheumatoid factor

was negative.

Two days later, Dr. Laurie Brodeur, Psy.D., evaluated

George's psychological impairments.  Dr. Brodeur observed that

George walked carefully and gingerly.  She was tearful

throughout the interview and spoke in a monotone and low voice.

At times her speech was disjointed.  Her affect was flat.  Dr.

Brodeur diagnosed George with bipolar II disorder and recurrent

major depressive episodes with hypomanic occurrences.

George told Dr. Brodeur that she could not remember a time

when she did not feel suicidal.  She stated that she had

overdosed on a medication in October 2010.  Instead of seeking treatment, her husband had watched her for two days while she slept.  She also reported suffering from anxiety since her youth.  Throughout her adult life, she had periods during which she had not slept, had cleaned obsessively, or had been highly productive.  She had a history of self-harming as a teenager, including superficial cutting of her arm because of stressful family circumstances.  As adult, she would destroy inanimate objects when angry.

George felt that her depression, anxiety, and mood swings had worsened markedly since age thirty-nine, when she went through menopause.  She reported that her mind rushed when her mood was high.  She described her sleep as poor and her mood as lethargic and depressed.  She was unable to experience pleasure from activities she usually found enjoyable.  She was irritable and had occasional significant panic attacks.  She was obsessed about order in her house, at times cleaning for days without sleep.  She had difficulty with semantic memory at times. George also reported having heard voices and seen things in the shadows of her peripheral vision.  She had odd thoughts about preventing bad things from happening.

Dr. Brodeur noted that George's concentration was poor. She was of average intelligence but disliked school.  Her fund of knowledge was average.  Dr. Brodeur opined that George had "marked" functional loss in the area of daily activities, "marked" loss in social functioning, "moderate" loss in task performance, and "marked" loss in stress reactions.  Dr. Brodeur recommended medication and therapy.  She noted that George was skeptical that she could find a therapist she could trust.  Dr. Brodeur opined that George's functional loss would be moderate with treatment, but she was guarded in her prognosis because of complications from George's medical conditions and the chronic history of her behavioral patterns.  She estimated that it would take three to four years for improvements to take hold.

On January 19, 2011, George was evaluated by Dr. Pancras Van der Iaan, M.D., at the Weeks Medical Center.  George reported that she had developed fibromyalgia at age 11 and that she was suffering from joint pain that had worsened over the prior five years.  She tested negative for rheumatoid arthritis. Dr. Van der Iaan diagnosed fibromyalgia, bipolar affective disorder, hypertension, and depression with anxiety.

On a separate questionnaire, Dr. Van der Iaan indicated that fibromyalgia was George's primary diagnosis.  She stated

12

that George had at least 11 out of 18 tender points upon digital palpation, in accordance with the 1990 diagnostic criteria for fibromyalgia established by the American College of Rheumatology.  She also stated that George had widespread pain consistent with her diagnosis.  Finally, she stated that the opinion given by Nurse Ryan in August 2010 was an accurate assessment of George's functional limitations.

## B.   **Administrative Proceedings**

After her claim for benefits was denied at the initial level, George requested a hearing before an ALJ.  ALJ Merrill held the hearing via video conference on January 21, 2011.  Both George and a vocational expert testified.  George was represented by counsel.

ALJ Merrill issued a decision denying George's claim on February 24, 2011.  The ALJ concluded that the only medically determinable impairment that George had was depression with possible bipolar disorder.  He denied her claim at Step Two of the sequential analysis based on a conclusion that her depression was not severe.  He discounted her diagnosis of fibromyalgia as unsupported by the medical record.  The Decision Review Board affirmed the ALJ's decision on May 27, 2011.

## II.   <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the transcript of the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  My review is limited to determining whether the ALJ used "the proper legal standards and found facts [based] upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference as long as they are supported by substantial evidence.  Id. Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion."  Id. at 770.

Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters

entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence on the record.  Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not the court, to resolve conflicts in the evidence.  Id.

The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled.  20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  The applicant bears the burden, through the first four steps, of proving that his impairments preclude him from working.  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  At the fifth step, the ALJ determines whether work that the claimant can do, despite his impairments, exists in significant numbers in the national economy and must produce substantial evidence to support that finding.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

## III.  ANALYSIS

George moves to reverse and remand the Commissioner's decision denying her application for disability insurance benefits.[3]  She contends that the ALJ impermissibly substituted

---

[3] The first form of relief George seeks is a remand with an order for payment of benefits.  A remand with instructions to pay is ordinarily "an unnecessary abrogation of the Commissioner's

his lay opinion for uncontroverted medical opinions in the record when he determined that she was not disabled.  The Commissioner contends that the ALJ did not overstep the bounds of lay competence and, alternatively, that any error is harmless.

At Step Two of the sequential analysis, ALJ Merrill determined that George did not have a severe impairment or combination of impairments and, accordingly, was not disabled for the purpose of her social security application.  The ALJ acknowledged that George had been diagnosed with fibromyalgia and bipolar disorder, but he discounted both diagnoses as not supported by the medical record or, alternatively, as causing only a minimal limitation on her ability to work.  The ALJ gave either "little" or "minimal" weight to the four medical opinions in the record that contradicted his determination.  Instead, he "rel[ied] primarily upon the medical evidence of record," as he

---

authority to adjudicate applications for disability benefits."  Seavey v. Barnhart, 276 F.3d 1, 10 (1st Cir. 2001).  Such extraordinary relief is warranted "only in the unusual case in which the underlying facts and law are such that the agency has no discretion to act in any manner other than to award or to deny benefits."  Id. at 11.  Claimant must show that "the proof of disability is overwhelming" or that "correcting the legal error clarified the record sufficiently that an award or denial of benefits was the clear outcome."  Id.  Because George has not satisfied either requirement, an award of benefits is not appropriate in this case.

inevitably had to do because no medical opinion supported his determination.  Tr. 13.  Because the ALJ judged matters entrusted to experts, the case must be remanded for further proceedings.

The opinions in the record were rendered by George's primary care nurse practitioner Ryan, treating physician Dr. Van der Iaan, treating psychiatric nurse practitioner MacDougall, and examining psychologist Dr. Brodeur.  Nurse Ryan diagnosed George with fibromyalgia, depression, and bipolar disorder, among other ailments.  She opined that George was incapable of performing even a low-stress job.  According to Nurse Ryan, George could sit or stand only for ten minutes at a time for a total of less than two hours each in an eight-hour workday.  She would need to take unscheduled breaks occasionally due to chronic pain, stiffness and fatigue, and would experience unpredictable episodic attacks of migraines, severe depression, fatigue, severe pain, and chronic memory loss.  Dr. Van der Iaan also examined George and opined that Nurse Ryan's opinion was an accurate assessment of George's functional limitations.  Dr. Van der Iaan diagnosed George with fibromyalgia and stated that George had at least 11 out of 18 tender points upon digital palpation and widespread pain consistent with her diagnosis.

Nurse MacDougall, who treated George's psychiatric conditions, opined that George was incapable of performing even a low-stress job due to bipolar disorder and depression.  Dr. Brodeur also evaluated George and similarly diagnosed her with bipolar disorder and recurrent major depressive episodes.  Dr. Brodeur opined that George had "marked" functional loss in the area of daily activities, "marked" loss in social functioning, "moderate" loss in task performance, and "marked" loss in stress reactions.

ALJ Merrill discounted all four medical opinions because they "contain inconsistencies and do not accurately reflect the longitudinal history presented in the treatment notes."  Tr. 11.  The opinions, however, were uncontroverted.  Although a state agency representative made a physical assessment that George could perform "light" work, that assessment was not completed by a medical source and the ALJ correctly assigned it no weight.  The state agency did not perform a mental health assessment.

Instead of relying on the uncontroverted medical opinions, the ALJ determined that medical evidence in the record supported a finding that George's conditions had a minimal impact on her ability to work.  "As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms

and no medical opinion supported the determination." Nguyen, 172 F.3d at 35; see Alcantara v. Astrue, 257 Fed. Appx. 333, 334 (1st Cir. 2007) ("Absent a medical advisor's or consultant's assessment of the full record, the ALJ effectively substituted his own judgment for medical opinion."); Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 430 (1st Cir. 1991) ("Since bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess claimant's residual functional capacity based on the bare medical record.").

The Commissioner argues that the ALJ did no more than render a common-sense judgment that George's impairments imposed only mild functional limitations on her ability to perform basic work activities. Although the First Circuit has stated that an ALJ is not "precluded from rendering common-sense judgments about functional capacity based on medical findings," the court has cautioned that the ALJ cannot "overstep the bounds of a lay person's competence and render a medical judgment." Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990). Here, ALJ Merrill overstepped his bounds. George's treatment record by no means supports a common-sense conclusion that her ailments were minimal. In fact, four medical sources

who either treated or examined her concluded that she was substantially impaired.  Although the ALJ was not required to credit those opinions, he could not render a contrary judgment without expert opinion that controverted the medical opinions in the record regarding the extent of George's impairments.

ALJ Merrill's decision is even more problematic because he determined that George was not disabled at Step Two of the sequential analysis.  Step Two was designed to implement "a threshold test of medical severity to screen out groundless claims - *i.e.*, those claims that, on a common sense basis, would clearly be disallowed were vocational factors to be considered." McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1123 (1st Cir. 1986).  A finding that a claimant is not disabled at this step of the analysis is appropriate only "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28, 1985 WL 56856, at *3.  Given the *de minimis* nature of the Step Two regulation, adjudicators are cautioned to exercise

> [g]reat care . . . in applying the not severe
> impairment concept.  If an adjudicator is unable to
> determine clearly the effect of an impairment or
> combination of impairments on the individual's ability
> to do basic work activities, the sequential evaluation

> process should not end with the not severe evaluation
> step.

Id. at *4.  ALJ Merrill failed to heed that warning.  Not only
did he find that George's impairments were not severe when the
record does not clearly support that finding, the ALJ also
concluded that her fibromyalgia was not a medically determinable
impairment.  Both George's primary care provider and a treating
physician, however, diagnosed her with fibromyalgia.  Dr. Van
der Iaan specifically indicated that she exhibited point
tenderness in at least 11 out of 18 specified sites, a clinical
finding that is sufficient to support a diagnosis of
fibromyalgia.  See Johnson v. Astrue, 597 F.3d 409, 412 (1st
Cir. 2009) ("[S]ince trigger points *are* the only 'objective'
signs of fibromyalgia, the ALJ effectively was requiring
objective evidence beyond the clinical findings necessary for a
diagnosis of fibromyalgia under established medical
guidelines[.]" (internal quotation marks and alterations
omitted)).  In the absence of medical opinion stating that the
treatment record did not warrant the diagnosis, the ALJ was not
entitled to conclude that George's fibromyalgia was not a
medically determinable impairment.  The error was not harmless,
as the Commissioner contends, because substantial evidence does

not support a finding that the condition only minimally impacted George's ability to work.

## IV.   CONCLUSION

For the foregoing reasons, I grant George's motion to reverse (Doc. No. 7), deny the Commissioner's motion to affirm (Doc. No. 11), and pursuant to 42 U.S.C. § 405(g), remand this case to the Social Security Administration for further proceedings consistent with this opinion.  The clerk is directed to enter judgment accordingly.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

June 7, 2012

cc:  Craig A. Jarvis, Esq.
     Gretchen Leah Witt, AUSA